**In re QUALITY STORES, INC., et al., Debtors.**

**Quality Stores, Inc., et al., Plaintiffs,**

**v.**

**United States of America, Defendant.**

**Bankruptcy No. GG 01–10662.**
**Adversary No. 05–80573.**

United States Bankruptcy Court, W.D. Michigan.

March 3, 2008.

---

Natalie Hoyer Keller, Kirkland & Ellis, LLP, Chicago, IL, for Quality Stores, Inc., et al.

Michael W. Davis, U.S. Department of Justice, Washington, D.C., for United States of America.

## OPINION REGARDING SEVERANCE PAY AND FICA CONTRIBUTIONS

JAMES D. GREGG, Chief Judge.

### I. INTRODUCTION

Employees of Quality Stores, Inc., et al. ("Debtors") received severance pay resulting from their involuntary termination from employment because of business cessation. The money received, without ques-

tion, constitutes "income" within the meaning of the Internal Revenue Code. The question is whether the receipt of the severance pay by the employees constitutes "wages" as well. "Income" and "wages" are not coterminous. Under the facts of this case, where is the legal boundary line between "income" and "wages" to be drawn?

## II. *ISSUE*

Are the Debtors entitled to a turnover from the United States of America, Internal Revenue Service ("IRS") of payments made for Federal Insurance Contributions Act ("FICA") taxes attributable to severance payments made to the Debtors' employees? [1]

## III. *JURISDICTION*

The court has subject matter jurisdiction over this bankruptcy case and this adversary proceeding. 28 U.S.C. § 1334. The case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.). This adversary proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(E) (turnover of property of the estate).

## IV. *FACTS*

The parties have stipulated to the relevant facts for purposes of this summary judgment motion ("Stip. Facts"). Prior to their bankruptcy cases, the Debtors operated a chain of retail stores specializing in agricultural supplies and related products. During the period preceding the bankruptcy cases (the "Prepetition Period"), the Debtors were forced to close approximately sixty-three stores and nine distribution centers. The Debtors also terminated ap-

proximately seventy-five employees at their corporate office during the Prepetition Period.

On October 20, 2001, an involuntary chapter 11 petition was filed against the Debtors. Quality Stores, Inc., answered the involuntary petition and consented to the entry of an order for relief on November 1, 2001. The remaining Debtors also commenced voluntary chapter 11 cases on November 1, 2001. After the petition date (the "Postpetition Period"), the Debtors closed their remaining 311 stores and three distribution centers. The Debtors also terminated all of their remaining employees.

The Debtors made severance payments to employees who were terminated during both the Prepetition and Postpetition Periods. The parties agree that the severance payments were made "pursuant to [severance plans] maintained by the Debtors." (Stip. Facts ¶ 15.) The parties further stipulate that the severance payments were made "because of the employees' involuntary separation from employment," which resulted "directly from a reduction in force or the discontinuance of a plant or operation." (Stip. Facts ¶ 15.) The severance payments were included in the employees' gross income, and the Debtors reported the severance payments as wages on the W–2 forms issued to employees. The Debtors withheld federal income tax and the employees' share of FICA tax from the severance payments. The Debtors also paid the employer's share of FICA tax with respect to the severance payments.

Under the Prepetition Severance Plan, the Debtors' senior executives received twelve to eighteen months of severance

---

**1.** This court freely acknowledges it is not an expert in tax law. At oral argument, both parties advised the court, regardless of its decision, this decision will be reviewed by the higher courts.

pay. All other employees received one week of severance pay for each full year of service. These payments were not connected to the receipt of state unemployment compensation and were not attributable to the rendering of any particular employment service. The severance payments were paid on a weekly or semi-weekly basis, in accordance with the Debtors' normal payroll period. Approximately $382,362 of the total refund requested in this adversary proceeding is attributable to severance payments made under the Prepetition Severance Plan.

Under the Postpetition Severance Plan, officers received six to twelve months of severance pay. Full-time salaried and hourly employees who had been employed for at least two years received one week of severance pay for each full year of service, up to a maximum of ten weeks for salaried employees and five weeks for hourly employees. Employees who had worked for the Debtors for less than two years received one week of severance pay, and the approximately 900 employees who were subsequently employed by the companies who purchased the Debtors' assets did not receive any severance pay. Like the prepetition severance payments, the postpetition payments were not connected to the receipt of state unemployment compensation and were not attributable to the rendering of any particular employment services. All severance payments for the Postpetition Period were paid in a lump sum. Approximately $617,763 of the total refund requested in this adversary proceeding is attributable to payments made under the Postpetition Severance Plan.

On September 17, 2002, the Debtors filed fifteen separate refund claims with the IRS, seeking to recover $1,000,125 in allegedly overpaid FICA taxes.[2] On June 1, 2005, the Debtors filed this adversary proceeding. The Debtors' complaint seeks to compel the IRS to turn over the alleged overpaid FICA taxes, plus interest, as property of the Debtors' bankruptcy estate. Because the issue presented in this adversary proceeding is a purely legal question, the parties filed stipulated facts and cross motions for summary judgment. Legal memoranda were filed, oral argument was held, and the court took the matter under advisement.

## V. DISCUSSION

### A. Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(c). FED. R. BANKR.P. 7056. Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). All material facts have been stipulated to by the parties to this adversary proceeding. The parties agree, and this court believes, that the legal issues presented are appropriate for resolution by summary judgment.

### B. Did the Severance Payments to the Debtors' Employees Constitute "Wages"?

 FICA taxes are imposed on employees' "wages" "to fund Social Security and Medicare Benefits." *Appoloni v. United States,* 450 F.3d 185, 189 (6th Cir. 2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1123, 166 L.Ed.2d 891 (2007). For

---

**2.** This amount includes the employer's share of FICA taxes paid by the Debtors and the employees' share of FICA taxes for those employees who consented to permit the Debtors to make the refund request on their behalf.

purposes of FICA, § 3121(a) of the Internal Revenue Code defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a).[3] The broad, inclusive nature of this definition has been recognized by both the United States Supreme Court and the Sixth Circuit Court of Appeals. *See Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 365–66, 66 S.Ct. 637, 641, 90 L.Ed. 718 (1946); *Gerbec v. United States*, 164 F.3d 1015, 1026 (6th Cir.1999). A broad interpretation of this definition has also been deemed consistent with Congress's intent "to impose FICA taxes on a broad range of remuneration in order to accomplish the remedial purposes of the Social Security Act." *Appoloni*, 450 F.3d at 190 (citation omitted).

An employee's "wages" are also the basis for measuring an employer's obligations under the income tax withholding provisions of the Internal Revenue Code. *Rowan Cos. v. United States*, 452 U.S. 247, 254, 101 S.Ct. 2288, 2293, 68 L.Ed.2d 814 (1981). For income tax withholding purposes, Congress choose to define the term "wages" in "substantially the same language that it used in FICA...." *Rowan*, 452 U.S. at 255, 101 S.Ct. at 2293. Accordingly, the income tax withholding provisions of the Internal Revenue Code define "wages" as "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3401(a).

In the income tax context, § 3402(*o*) extends the withholding requirement to "certain payments *other than* wages" including (1) "any supplemental unemployment compensation benefit paid to an individual;" (2) certain annuity payments to an individual; and (3) certain payments of sick pay to an individual. 26 U.S.C. § 3402(*o*) (emphasis added). Section 3402(*o*)(1) states that

---

3. Section 3121 provides, in pertinent part:

(a) Wages.—For purposes of this chapter, the term "wages" means all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash; except that such term shall not include—

. . .

(2) the amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which makes provision for his employees generally (or for his employees generally and their dependents) or for a class or classes of his employees (or for a class or classes of his employees and their dependents), on account of—

(A) sickness or accident disability (but, in the case of payments made to an employee or any of his dependents, this subparagraph shall exclude from the term wages only payments which are received under a workmen's compensation law), or

(B) medical or hospitalization expenses in connection with sickness or accident disability, or . . .

(4) any payment on account of sickness or accident disability, or medical or hospitalization expenses in connection with sickness or accident disability, made by an employer to, or on behalf of, an employee after the expiration of 6 calendar months following the last calendar month in which the employee worked for such employer,

(5) any payment made to, or on behalf of, an employee or his beneficiary—

. . .

(B) under or to an annuity plan which, at the time of such payment, is a plan described in section 403(a),

. . .

(D) under or to an annuity contract described in section 403(b), other than a payment for the purchase of such contract which is made by reason of a salary reduction agreement (whether evidenced by a written instrument or otherwise). . . .

26 U.S.C. § 3121(a).

each of these types of payments shall be "treated *as if it were a payment of wages*" for income tax withholding purposes.[4] 26 U.S.C. § 3402(*o*)(1) (emphasis added). The Internal Revenue Code defines "supplemental unemployment compensation benefits" as:

amounts which are paid to an employee, pursuant to a plan to which the employer is a party, because of an employee's involuntary separation from employment (whether or not such separation is temporary), resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions, but only to the extent such benefits are includible in the employees gross income.

26 U.S.C. § 3402(*o*)(2)(A). In this adversary proceeding, the Debtors and the IRS have stipulated that the severance payments made under both the Pre- and Postpetition Severance Plans meet this definition. (Stip. Facts ¶ 15.)

The Debtors assert that supplemental unemployment compensation benefits are not wages for income tax withholding purposes, but in accordance with § 3402(*o*), are merely treated *as if they were wages*. As additional support for this proposition, the Debtors examine the legislative history of § 3402(*o*). The Senate report explained that supplemental unemployment compensation benefits were not subject to withholding under prior law "because they [did] not constitute wages or remuneration for services." S.Rep. No. 91–552, at

268(1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2305–06. Section 3402(*o*) makes these payments subject to withholding because "although these benefits are not wages" they are "generally taxable income to the recipient" and "the absence of withholding on these benefits may require a significant final tax payment by the taxpayer receiving them." *Id.*

The Debtors argue that if supplemental unemployment compensation benefits are not wages for purposes of income tax withholding, they are likewise not wages for purposes of FICA taxation. This assertion is anchored upon the United States Supreme Court's decision in *Rowan Cos. v. United States*, 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981). In *Rowan*, the Supreme Court considered whether the definition of "wages" under FICA and the Federal Unemployment Tax Act ("FUTA") included the value of meals and lodging provided to employees working on Rowan Companies' offshore oil rigs. Pursuant to the Treasury Regulations in effect at the time, the IRS included the fair value of these meals and lodging in withholding "wages" for purposes of FICA and FUTA, but not for income tax withholding purposes. The Treasury Regulations prescribed this practice notwithstanding the fact that Congress defined the term "wages" in "substantially identical language for each of these three obligations upon employers." *Rowan*, 452 U.S. at 249, 101 S.Ct. at 2290.

---

4. Section 3402(*o*)(1) provides:
(1) General rule.—For purposes of this chapter . . .—
(A) any supplemental unemployment compensation benefit paid to an individual,
(B) any payment of an annuity to an individual, if at the time the payment is made a request that such annuity be subject to withholding under this chapter is in effect, and

(C) any payment to an individual of sick pay which does not constitute wages . . ., if at the time the payment is made a request that sick pay be subject to withholding under this chapter is in effect,
shall be treated as if it were a payment of wages by an employer to an employee for a payroll period.
26 U.S.C. § 3402(*o*)(1).

Based on the nearly identical definitions of "wages" in the three statutes, the Supreme Court concluded that "Congress intended 'wages' to mean the same thing under FICA, FUTA, and income-tax withholding." *Rowan*, 452 U.S. at 254, 101 S.Ct. at 2293. According to the Court, the statutory scheme was born out of "congressional concern for 'the interest of simplicity and ease of administration.'" *Rowan*, 452 U.S. at 254, 101 S.Ct. at 2293–94 (citation omitted). The Court found that "[i]t would be extraordinary for a Congress pursuing this interest to intend, without ever saying so, for identical definitions to be interpreted differently." *Rowan*, 452 U.S. at 257, 101 S.Ct. at 2294. Therefore, the Court held that the Treasury Regulations were invalid, because they "fail[ed] to implement the statutory definition of 'wages' in a consistent or reasonable manner." *Rowan*, 452 U.S. at 263, 101 S.Ct. at 2298.

The arguments proffered by the Debtors in this adversary proceeding were thoroughly analyzed and accepted by the United States Court of Federal Claims in a recent opinion, *CSX Corp. v. United States*, 52 Fed.Cl. 208 (Fed.Cl.2002). *CSX* involved an almost identical issue to the one presented in this adversary proceeding, i.e., whether payments made by the employer under a reduction in force program constituted "wages" for purposes of FICA taxation.[5] Relying on the similarities in the definitions of "wages" for purposes of FICA and income tax withholding, the treatment of "supplemental unemployment compensation benefits" as non-wages in § 3402(*o*), and the Supreme Court's holding in *Rowan*, the *CSX* court concluded that FICA taxes did not apply to the payments. The court explained:

[P]ayments that are nonwage payments from the start are beyond FICA taxation as much as they are beyond income-tax withholding.

———

Since supplemental unemployment compensation benefits "do not constitute wages or remuneration for services" ... their taxation under FICA would require their specific inclusion in § 3121(a). And because there is no specific inclusion of supplemental unemployment compensation benefits in § 3121(a), no FICA taxes apply to such payments.

*CSX Corp.*, 52 Fed.Cl. at 215–16 (internal citation omitted).

In reaching this conclusion, the *CSX* court rejected many of the same arguments raised by the IRS in this adversary proceeding. This court will address each of the IRS's arguments in turn.

### 1. Decoupling Amendment

First, the IRS argues that Congress explicitly rejected the holding in *Rowan* when it enacted the Social Security Amendments of 1983, Pub.L. No. 98–21, 97 Stat. 65 (1983). According to the IRS, these amendments contain a "decoupling" provision that specifically rejects *Rowan's* conclusion that wages should be defined the same for purposes of income tax withholding and FICA taxation. The "decoupling" amendment states:

Nothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from "wages" as used in such chapter shall be construed to require a similar exclusion from "wages"

---

5. *CSX* also addressed whether the reduction in force payments were "compensation" under the Railroad Retirement Tax Act ("RRTA"). *See* 26 U.S.C. §§ 3201–3202 and 3231–3233. The RRTA's definition of "compensation" is essentially identical to FICA's definition of "wages." *Compare* 26 U.S.C. § 3121(a) *with* 26 U.S.C. § 3231(e).

in the regulations prescribed for purposes of this chapter.

26 U.S.C. § 3121(a). The IRS argues that the legislative history of the "decoupling" amendment further illustrates Congress's rejection of the holding in *Rowan.* For instance, the Senate Report explains:

> [T]he committee believes that amounts exempt from income tax withholding should not be exempt from FICA unless Congress provides an explicit FICA tax exclusion.
>
> . . . .
>
> The bill provides that ... the determination of whether or not amounts are includible in the social security wage base is to be made without regard to whether such amounts are treated as wages for income tax withholding purposes. Accordingly, an employee's "wages" for social security tax purposes may be different from the employee's "wages" for income tax withholding purposes.

S.Rep. No. 98–23, at 42 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 183.[6]

As noted by the *CSX* court, the IRS's argument on this point has some superficial appeal. The court explained that by enacting the "decoupling" amendment "Congress has indeed gone on record as saying that the income-tax withholding system and the FICA-tax withholding system each serves a different interest which may, in turn, dictate differences in the make-up of their respective wage bases." *CSX Corp.,* 52 Fed.Cl. at 213. However, the *CSX* court ultimately rejected the IRS's argument, finding that the "decoupling" amendment enacted by Congress to facilitate differentiation between income tax withholding and FICA taxation "is not self-executing." *Id.* Rather, "its operation depends on the promulgation of regulations that in fact establish distinctions between wages for income-tax withholding purposes and wages for FICA-tax withholding purposes." *Id.* Without such regulations, there is "no basis for distinguishing between the content of the term 'wages' for income-tax withholding purposes and the content of that term for FICA-tax withholding purposes. Simply put, the holding of *Rowan* remains in place." *Id.; see also HB & R, Inc. v. United States,* 229 F.3d 688, 692 (8th Cir. 2000) (noting that "Congress 'decoupled' the definition of wages for income and FICA tax purposes to allow the Commissioner to promulgate regulations providing different withholding exclusions...."); *Anderson v. United States,* 929 F.2d 648, 653 n. 10 (Fed.Cir.1991) (opining, in dicta, that the "decoupling" amendment provides "for treating 'wages' in both statutes differently, but only through exclusions promulgated by regulation").

This court agrees with the *CSX* opinion. The "decoupling" amendment overrules

---

**6.** The IRS asserts that the *CSX* court erred by not according more weight to the Congress's intent as expressed in this legislative history to the "decoupling" amendment. However, it is well-settled that "[w]hen interpreting a statute, courts must first consider the plain language of the statute, and resort to a review of congressional intent or legislative history only when the language of the statute is not clear." *QSI Holdings, Inc. v. Alford,* 382 B.R. 731, 737, 2007 WL 4557855 *3 (W.D.Mich.2007) (citing *In re Comshare, Inc. Sec. Litigation,* 183 F.3d 542, 549 (6th Cir.1999)); *see United* *States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (when a "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'") (citation omitted). Here, the statutes are not ambiguous. Therefore, the *CSX* court properly declined to "draw upon the legislative history of the decoupling provision' to establish a distinction between wages for FICA purposes and wages for income-tax purposes despite the absence of any law, expressed either in statute or regulation, creating such a distinction." *CSX Corp.,* 52 Fed.Cl. at 214 n. 7.

*Rowan* to the extent that it gives the IRS the ability to define "wages" differently for income and FICA tax purposes through valid regulations. However, *Rowan's* more narrow holding—that, as a threshold matter, the term "wages" should be interpreted the same for FICA and income tax withholding purposes—remains binding. This court therefore rejects the IRS's argument that the "decoupling" amendment supersedes the Supreme Court's decision in *Rowan.*

### 2. *The Revenue Rulings*

The IRS is unable to point to any regulation that would require the severance payments to be treated differently for FICA purposes than they are for income tax withholding purposes. The IRS argues, however, that it has established a limited exception to FICA's definition of "wages" for certain payments made upon an employee's separation from the employer's service. The IRS maintains that this limited exception was promulgated through a series of revenue rulings, "culminating in Rev. Rul. 90–72, 1990–2 C.B. 211." (Dft. Brief at 9.) According to the IRS, this exception only applies if: (1) the employee was involuntarily separated from service due to a plant closing, layoff, or reduction in force; (2) the employee also received state unemployment compensation; (3) the supplemental unemployment compensation payment was not received as a lump sum. The parties have stipulated that the payments at issue in this adversary proceeding do not meet these criteria. (Stip. Facts ¶ 21, 27 & 28.)

 Revenue rulings do not have the binding force of statutory provisions or the presumption of correctness of the regulations. *See Appoloni v. United States,* 450 F.3d 185, 194 (6th Cir.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1123, 166 L.Ed.2d 891 (2007) (citing *Skidmore v.*

*Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)); *Aeroquip–Vickers, Inc. v. Comm'r,* 347 F.3d 173, 181 (6th Cir.2003) (noting that "the IRS does not invoke its authority to make rules with the force of law" when it issues revenue rulings). However, some varying degree of deference to revenue rulings is required. [T]he level of deference to be accorded to [revenue rulings] depends upon "the thoroughness evident in [the ruling's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade...." *Aeroquip–Vickers, Inc.,* 347 F.3d at 181; *see Appoloni,* 450 F.3d at 194. Applying this standard to Rev. Rul. 90–72, the court opines that the ruling is not entitled to persuasive deference.

First, the IRS's treatment of "supplemental unemployment compensation benefits" has not been very consistent over time. *See, e.g.,* Rev. Rul. 56–249, 1956–1 C.B. 488, 492 (first establishing a limited exception from the FICA, FUTA, and income tax withholding definition of "wages" for certain payments made to an employee upon his or her involuntary separation from employment; the ruling set forth eight criteria that must be met for payments to qualify for this exception); Rev. Rul. 58–128, 1958–1 C.B. 89 (broadening and clarifying the scope of Rev. Rul. 56–249); Rev. Rul. 60–330, 1960–2 C.B. 46, Rev. Rul. 71–408, 1971–2 C.B. 340; Rev. Rul. 77–347, 1977–2 C.B. 362 (reversing course, and stating that benefits did not be tied to the receipt of state unemployment benefits to be considered supplemental unemployment compensation benefits for purposes of FICA, FUTA and income tax withholding); Rev. Rul. 90–72, 1990–2 C.B. at 212 (stating that "[t]he portion of Rev. Rul. 77–347 concluding that benefits do not have to be linked to state unemployment

compensation in order to be excluded from the definition of wages for FICA and FUTA tax purposes is inconsistent with the underlying premises for the exclusion and is therefore hereby revoked").

More importantly, the revenue ruling relied upon by the IRS, 90–72, offers no cogent explanation for its overly broad conclusion that "the definition of [supplemental unemployment compensation benefits] under section 3402(o) is not applicable for FICA or FUTA purposes." 1990–2 C.B. at 211–12. In the absence of such analysis, this court is unable to ignore or downplay the plain language of §§ 3121(a) and 3402(o) and *Rowan's* admonition that the income tax and FICA provisions are to be interpreted and applied consistently.

### 3. Statutory Exclusions from FICA Definition of "Wages"

The IRS's third argument arises from differences in the statutory exclusions under the income tax withholding scheme, § 3402(o), and the FICA provisions, § 3121(a). The IRS notes that only two of the three types of payments "treated as wages" for income tax purposes— i.e., annuity payments and sick pay, but not supplemental unemployment compensation benefits—are also specifically excluded from FICA wages under § 3121(a). According to the IRS, it was unnecessary for Congress to exclude annuity payments and sick pay from FICA's definition of "wages" if all three of the items referred to in § 3402(o), including supplemental unemployment compensation benefits, were already considered non-wage payments for purposes of FICA.

As the *CSX* court discussed in its detailed analysis of this argument, the reason for these exclusions is explained by the disparate nature of the types of payments. For instance, annuity payments are considered "remuneration for services" and are thus deemed "wages" for purposes of both FICA and income tax withholding. Nonetheless, these payments are specifically excluded from the definition of "wages" under the two statutes. By enacting § 3402(o), Congress gave employees the option of requesting that such payments be subject to income tax withholding (i.e., to have the payments "treated as if they were wages"), to help the employee cushion an unexpectedly large tax bill at the year end. Supplemental unemployment compensation benefits, on the other hand, are not considered to be "remuneration for services." Accordingly, these types of payments do not initially fall under the statutory definitions of "wages," and there is no good reason to specifically exclude them from FICA taxation.

Again, the rationale of the *CSX* court is persuasive: "the absence of an exclusion from the definition of wages for FICA purposes is not determinative of whether a particular payment is subject to FICA taxation." *CSX Corp.*, 52 Fed.Cl. at 216. Instead, "[t]he question that needs to be asked is whether the payment falls outside the definition of wages from the start." *Id.* The taxation of non-wage payments "requires their specific inclusion in the taxing scheme." *id.* at 215 (emphasis in original).

### 4. Sixth Circuit Precedent—Appoloni v. United States

Finally, the IRS asserts that this court should not adopt the "extremely narrow and strained interpretation" of "wages" for purposes of FICA taxation employed by the court in *CSX* because such interpretation is "thoroughly inconsistent" with Sixth Circuit case law which instructs that FICA is to be broadly construed. (Dft. Br. at 15.) The IRS refers to *Appoloni v. United States,* 450 F.3d 185 (6th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1123, 166 L.Ed.2d 891 (2007). The issue in *Appoloni* was whether payments made to public school teachers, who resigned from their

positions and relinquished their tenure rights upon receipt of such payments, were taxable "wages" under FICA. *Id.* at 189. Based largely on the eligibility requirements for receipt of the payments, the court held that the payments were remuneration "for services performed" and consequently, were "wages" for purposes of FICA taxation. *Id.* at 191. The court reached this conclusion despite the fact that the teachers also relinquished tenure rights by accepting the payments. id. at 192–95 (rejecting *North Dakota State Univ. v. United States,* 255 F.3d 599 (8th Cir.2001)). The Sixth Circuit's analysis of the issue also emphasized the "broad, inclusive nature" of FICA's definition of "wages." *Id.* at 190 (citing *Social Security Bd. v. Nierotko,* 327 U.S. 358, 365–66, 66 S.Ct. 637, 641, 90 L.Ed. 718 (1946); *Gerbec v. United States,* 164 F.3d 1015, 1026 (6th Cir.1999)). The IRS concedes that *Appoloni* is not directly on point, but argues that the decision illustrates the Sixth Circuit's general approach to interpreting the definition of "wages" for purposes of FICA taxation.

This court agrees that *Appoloni* is not directly relevant to the issue presented in this adversary proceeding. Importantly, in contrast to the payments at issue in this adversary proceeding, the payments in *Appoloni* did not qualify as "supplemental unemployment compensation benefits" under § 3402(*o*). Therefore, the facts in *Appoloni* did not require the Sixth Circuit to determine whether "supplemental unemployment compensation benefits" should be deemed "wages" under FICA. Instead, the *Appoloni* court applied the general definition of "wages" to the payments at issue in that case.

However, notwithstanding the different issues discussed, this court believes that *CSX* and *Appoloni* are consistent. After concluding that "supplemental unemployment compensation benefits" were not

wages under FICA, the second portion of the *CSX* opinion addressed whether the specific payments at issue in that case actually qualified as "supplemental employment compensations benefits" under § 3402(*o*). In making this determination, the *CSX* court stated it was "mindful" that FICA was subject to broad interpretation and cited the same precedent relied upon in *Appoloni* for this proposition. *CSX Corp.,* 52 Fed.Cl. at 218 (citing *Nierotko,* 327 U.S. at 366, 66 S.Ct. at 641). The *CSX* court went on to conclude that separation payments to "employees who elect[ed] separation in lieu of remaining in their existing positions" did "not qualify as supplemental unemployment compensation benefits" because those employees were not "involuntarily separated" from their employment. *CSX Corp.,* 52 Fed.Cl. at 220. The *CSX* court held that these separation payments were "wages" despite the fact that the employees relinquished certain rights to receive them. *Id.* at 221 (When "job-related benefits [tike vacation pay, sick pay, layoff pay, seniority or tenure rights] are relinquished in favor of a lump-sum payment, the transaction simply amounts to a redemption, paid in cash, of wage amounts previously paid in kind.") (also rejecting *North Dakota,* 255 F.3d 599). Interestingly, *Appoloni* cited this portion of the *CSX* opinion in its discussion of the effect of relinquishment of tenure rights and expressly agreed with the reasoning employed therein. *Appoloni,* 450 F.3d at 195.

### 5. *Summary*

Simply stated, this court agrees with the *CSX* opinion. Considering the nearly identical statutory definitions, and under the Supreme Court's decision in *Rowan,* the term "wages" should be interpreted the same for both FICA and income tax purposes. Because "supplemental unemployment compensation benefits" are not "wages" for purposes of income tax with-

holding, they are likewise not "wages" under FICA. Although the "decoupling" provision gives the IRS the ability to establish distinctions between the two statutory definitions, such distinctions must be made through the promulgation of valid regulations. No such regulations exist. Accordingly, this court concludes that the payments made to the Debtors' employees pursuant to the Pre- and Postpetition Severance programs are not "wages" for purposes of FICA taxation. The IRS shall refund the overpaid FICA taxes to the Debtors' bankruptcy estate.

## VI. CONCLUSION

For the reasons stated above, the Debtors' motion for summary judgment is GRANTED and the IRS's cross motion for summary judgment is DENIED. A further hearing shall be scheduled as soon as is practicable to determine the amount of the refund to be turned over, including a calculation of the interest to be paid. A separate order shall enter accordingly.